**In re Fred C. PATTERSON, Jr. and Mary Patterson, Debtors.**

**Fred C. PATTERSON and Mary Patterson, Plaintiffs,**

v.

**B.F. GOODRICH EMPLOYEES FEDERAL CREDIT UNION, Defendant.**

**Bankruptcy No. 90–70139. Adv. No. 90–70032.**

United States Bankruptcy Court, N.D. Alabama, W.D.

Oct. 5, 1990.

Annette Crain, Tuscaloosa, Ala., for debtors and plaintiffs.

C. Michael Stilson, Tuscaloosa, Ala., Standing Trustee.

Michael E. Bybee, Birmingham, Ala., for defendant.

## MEMORANDUM OF DECISION

GEORGE S. WRIGHT, Chief Judge.

This matter came before the Court on the Debtors' February 8, 1990 motion to restrain Creditor B.F. Goodrich Employees Federal Credit Union from closing accounts held by Debtors with the financial institution and to award Debtors costs incurred from the Credit Union's actions.

Debtors contended that: I. Creditor's action was a violation of the automatic stay provisions of 11 U.S.C. Section 362 and II. That Creditor's action was unlawful discrimination because of Debtors' bankruptcy as prohibited by 11 U.S.C. Section 525.

B.F. Goodrich Employees Federal Credit Union, on the other hand, maintained it had not violated the automatic stay by the "freeze," citing its common law, statutory and contractual lien rights to serve "a form of notice"[1] of setoff rights. It contended

its actions were not unlawful discrimination due to bankruptcy. Creditor asked that Debtors' motion be denied and that it be granted relief from the automatic stay. The latter was granted in March.

After reviewing the record of the case, including testimony at a February 23, 1990 hearing, documents on file and the briefs of the parties, it is the opinion of this Court that the Debtors' motion is due to be granted.

## FINDINGS OF FACT

Fred C. Jr. and Mary L. Patterson filed a Petition for Relief under Chapter 13 of Title 11 of the U.S.Code on January 17, 1990. The Debtors' plan, which proposed to pay 100 percent to unsecured creditors, was confirmed on February 23, 1990.

At the time the Pattersons filed their petition, they owed the Credit Union an estimated $3,626.55. They listed the Credit Union as a secured creditor with a 1981 Chevrolet Pickup as collateral. The Debtors had maintained a share account and share draft account with the Credit Union since Fred Patterson was employed by Uniroyal approximately four years before. The Pattersons listed $822.78 as the amount in the share draft account.

In a January 23, 1990 letter, less than a week after the petition was filed, the debtors were notified by the Credit Union that: "Please be advised that due to the fact that you have filed a Bankruptcy, the credit union will cease deposit to or withdrawal from your accounts."[2] Claims No. 2, 3, 4 and 5, on file in the Pattersons' Chapter 13 case, showed balances due on four loans— $110.82, $254.28 (the Credit Union said it did not "apply" the $668.24 balance it showed in the couple's savings account to this $922.52 loan balance on January 24, 1990—it merely "reduced" that loan balance to the $254.28 shown on the proof of claim by the amount of the savings ac-

---

1. Creditor's Reply Brief, Document 8, AP 90–70032.

2. See Debtors' Exhibit 4, signed by Edith R. Thomas, Collection Supervisor for the Credit Union.

count)[3], $2,419.27 and $204.23 respectively.

On January 26, 1990, the Debtors filed Adversary Proceeding No. 90–70015, a complaint for the turnover of funds in accounts frozen by B.F. Goodrich Employees Federal Credit Union. On February 8, 1990, the Debtors filed Adversary Proceeding No. 90–70032 against the Credit Union seeking to prevent it from closing the accounts and to recover costs of the adversary proceeding.

Documents in the case reflect that payments on all four obligations claimed by the Credit Union were due on the 10th of each month, and testimony showed the ongoing payroll deduction for the loans continued up to and even after the Pattersons' bankruptcy filing. Therefore, there was no default on any obligations owed the Credit Union at the point it announced its freeze with the January 23, 1990 letter.

At the February 23, 1990 confirmation hearing, James P. Phillips, manager of the B.F. Goodrich Employees Federal Credit Union, testified that the Credit Union's policy is to stop all services to members when the Credit Union receives notice of a bankruptcy filing (even on a 100 percent payment to unsecured creditors in Chapter 13 plan). At this hearing, the Creditor also asked for relief from the stay on the already impounded funds based on its claimed lien rights.

Mr. Phillips testified in answer to several questions that this cessation and/or freeze of Credit Union services had nothing to do with loss to the Credit Union caused by the Pattersons. He said the Credit Union's board directs staffers to cease all services immediately on bankruptcy filing alone.

Fred C. Patterson Jr. testified at the hearing that the Debtors had outstanding checks at the time the "freeze" was placed on their checking account by the Credit Union. Although the Debtors attempted to make deposits to cover these checks, the Credit Union would not accept the funds and seven checks were returned to the payees for insufficient funds, Mr. Patterson testified. The Pattersons suffered a

"not sufficient funds" service charge for these returned checks in the amount of $40 because of the "freeze." Mary L. Patterson also testified at the hearing that in the four years the couple had been members of the Credit Union, they had never had a check returned for insufficient funds until the "freeze" after their bankruptcy.

Mr. Patterson said that Mr. Phillips informed him in a telephone conversation that he could no longer write checks, cash checks or make deposits because of his Chapter 13 filing. He said that, in a second telephone conversation, Mr. Phillips told him that "if he would reaffirm his debt[4] to the Credit Union or make the obligation non-plan," the Pattersons' Credit Union services would be restored.

In answer to a question from the Court, Mr. Phillips testified that normally the Credit Union would pay overdrafts when the member writing the checks had funds in a share account—but not in this particular case where the account was frozen. He also said that while the Credit Union froze services to the Pattersons, its regular payroll deduction of $225 per week continued for three weeks after the filing of the Chapter 13 petition on January 17, 1990. He described the Pattersons as still being members in good standing of the Credit Union despite the freeze then in place on prepetition funds and the termination of service.

The record in this case reflects that the Credit Union moved to "reduce" one of its loan balances by the amount in the debtors' savings account before any payment was due, much less delinquent, on the loan. For the earliest the Pattersons could have been delinquent on their Credit Union obligations was after February 10, 1990 when the next payments were due.

Services were also "frozen", deposits refused and checks returned for insufficient funds, before the Pattersons were late or in default on a payment and while payroll deduction in favor of the Credit Union continued.

---

**3.** Creditor's Reply Brief, Document 8, AP 90–70032, at p. 11.

**4.** Inasmuch as this is a Chapter 13 case, reaffirmation is unnecessary and not required.

On March 20, 1990, the Court held a preliminary hearing on a motion to lift the stay filed by B.F. Goodrich Employees Federal Credit Union in connection with Adversary Proceeding No. 90–70015. Following that hearing, and by consent of the parties, the Court granted the Credit Union's motion, in effect ratifying the setoff of some $643.16 in "shares" in the Patterson savings account. The Debtors withdrew their complaint for turnover of those funds. An order to that effect was entered March 23, 1990.

That determination left Adversary Proceeding No. 90–70032, the complaint to restrain the Creditor from closing the Pattersons' accounts and asking for an award of the costs the debtors have suffered in this matter, still active. This decision addresses that complaint.

Based on the totality of evidence on file in this case, including Debtors' Exhibit 4; Claims No. 2, 3, 4, and 5; and the testimony of Mr. Phillips, it is obvious that B.F. Goodrich Employees Federal Credit Union froze the Pattersons' accounts, impounding the contents of accounts to "reduce" a loan balance, refusing deposits, returning checks and denying them all services available to other members solely because they filed the Chapter 13 petition and in advance of any adjudication of the issue.[5]

### CONCLUSIONS OF LAW

The Court must review the situation between the Pattersons and their Credit Union along two statutory lines of inquiry:

I. Did the action of B.F. Goodrich Employees Federal Credit Union to "freeze" services and funds constitute a violation of the automatic stay that under 11 U.S.C. § 362 gives debtors "breathing room" to reorganize? Or was it a valid means of "notice" of intent to claim setoff rights guaranteed creditors under 11 U.S.C. § 553?

II. Did the actions of the Credit Union constitute discrimination based solely on the fact of the debtors' bankruptcy as prohibited by 11 U.S.C. § 525(b)?

The short answer to both questions is yes. The Credit Union's unilateral and unadjudicated action against the Pattersons was not a valid setoff action under either state or federal law prior to the order of this court in March. Consequently, the act violated the 11 U.S.C. § 362(a) automatic stay. Additionally, the Credit Union's freeze of the Debtors' checking accounts and services in conjunction with other communications with the Debtor constitute a violation of the stay. The action also violates the antidiscrimination provisions of 11 U.S.C. § 525(b).

### I.

### THE CREDIT UNION'S ACTION IS A VIOLATION OF THE AUTOMATIC STAY OF SECTION 362

A. FUNDS IN THE PATTERSONS' ACCOUNTS WERE PROPERTY OF THE BANKRUPTCY ESTATE UNDER 11 U.S.C. §§ 541(a) AND 1306(a).

Imposition of an administrative "freeze" on a bankrupt debtor's account has been a highly controversial topic before the courts in recent years. The difficult and complex issues surrounding application of the administrative "freeze" have resulted in a split in authority on the issue. It is also a rapidly evolving area of the law— with significant trial-court-level decisions published in the months since the Patterson hearing.

The viewpoint that must be taken by the courts is impacted by the July 10, 1984 amendment of 11 U.S.C. § 362(a)(3) which added the words "or to exercise control over property of the estate." Addition of that phrase broadened the automatic stay violation delineated in Section 362(a) to cov-

---

**5.** In its brief, Creditor contends at 22–3: "The policy in issue before this Court does not discontinue services *solely* on the grounds that a member has filed bankruptcy. Rather, the policy effects a discontinuance of services to *all* members who *cause the Credit Union a loss,* whether by bankruptcy *or otherwise.*" However, Phillips was specific in his hearing testimony that these debtors had caused the Credit Union no loss, that the freeze was applied only because of the bankruptcy.

er a wider array of acts than mere possession. The Congressional intent expressed by the amendment, cannot be ignored in analysis of "administrative freezes" as acts to exercise control over property of the estate.

Some courts have held that such a freeze is the functional equivalent of an unauthorized setoff in violation of 11 U.S.C. § 362(a)(7). See *Small Business Administration v. Rinehart,* 887 F.2d 165 (8th Cir. 1989); *United States v. Reynolds,* 764 F.2d 1004 (4th Cir.1985); *United States v. Norton,* 717 F.2d 767 (3rd Cir.1983) for examples of this reasoning. (The Third Circuit previously held that banks could not set off debts against a corporate account during Chapter 11 reorganization pendency without request and receipt of relief from the automatic stay in the Bankruptcy Court. *In re Penn Central Transportation Co.,* 453 F.2d 520 (3rd Cir.1972)).

Additionally, more courts have found that such freezes violate § 362(a)(3) since that section was amended to forbid "any act" to control property of a bankruptcy estate during the stay. At trial court level, there has been increased movement toward

holding such freezes to be violations of the stay either via Sections 362(a)(3) or (7) since the amendment of Section 362(a)(3).[6]

Still other decisions have held that the administrative freeze serves the policies underlying the Bankruptcy Code by preserving the assets of the estate until a court determination. See *Rio v. Army Aviation Center Federal Credit Union,* 82 B.R. 138 (D.M.D.Ala.1986); *National Bank of Georgia v. Air Atlanta,* 74 B.R. 426 (Bkrtcy.N.D.Ga.1987) and *In re Edgins,* 36 B.R. 480 (9th Cir.BAP 1984) for this line of reasoning. However, it is noteworthy that most decisions espousing the view that an administrative freeze is not a violation of the stay were returned prior to the July 10, 1984 amendment of Section 362(a)(3). That includes *In re Edgins,* the only statement of this viewpoint at the appeals court level.[7]

The Court of Appeals for the Eleventh Circuit has not yet ruled on this question. In light of the changed language of Section 362(a)(3) as well as the general philosophy of the automatic stay in bankruptcy, the better view is that an administrative freeze such as the one under consideration here is

---

**6.** Courts in the following cases have found that administrative freezes violation the automatic stay of Section 362(a):

*Small Business Administration v. Rinehart,* 887 F.2d 165 (8th Cir.1989) (Chapter 11); *United States v. Reynolds,* 764 F.2d 1004 (4th Cir.1985) (Chapter 13); *United States v. Norton,* 717 F.2d 767 (3d Cir.1983) (Chapter 13); *Cussano v. Fidelity Bank,* 29 B.R. 810 (D.E.D.Pa.1983), *vac'd and remanded without op.* 734 F.2d 3 (3d Cir.1984) (Chapter 13); *In re First Connecticut Small Business Investment Co.,* 118 B.R. 179 (Bkrtcy.D. Conn.1990); *In re Homan,* 116 B.R. 595 (Bkrtcy. S.D.Ohio 1990) (Chapter 13); *In re Drexel Burnham Lambert Group, Inc.,* 113 B.R. 830 (Bkrtcy. S.D.N.Y.1990) (Chapter 11); *In re Guinn,* 102 B.R. 838 (Bkrtcy.N.D.Ala.1989) (Chapter 13); *In re New York City Shoes,* 78 B.R. 426 (Bkrtcy.E. D.Pa.1987) (Chapter 11); *In re Crispell,* 73 B.R. 375 (Bkrtcy.E.D.Mo.1987) (Chapter 7); *In re Wildcat Construction Co., Inc.,* 57 B.R. 981 (Bkrtcy.D.Vt.1986) (Chapter 11); *In re LHG Resources, Inc.,* 34 B.R. 202 (Bkrtcy.W.D.Tex.1983) (Chapter 11); *In re Executive Associates, Inc.,* 24 B.R. 171 (Bkrtcy.S.D.Tex.1982) (Chapter 11); *In re Nelson,* 6 B.R. 248 (Bkrtcy.D.Kan.1980) (Chapter 7).

**7.** A rough alignment of post–1984 cases saying that a freeze is not a violation of the stay or

tantamount to setoff is as follows: *Rio v. Army Aviation Center Federal Credit Union,* 82 B.R. 138 (D.M.D.Ala.1986) (Chapter 13); *In re Learn,* 95. B.R. 495 (Bkrtcy.N.C.Ohio 1989) (Chapter 13); *In re Craddock–Terry Shoe Corp.,* 91 B.R. 392 (Bkrtcy.W.D.Va.1988) (Chapter 11); *National Bank of Georgia v. Air Atlanta,* 74 B.R. 426 (Bkrtcy.N.D.Ga.1987) (Chapter 11); *In re Williams,* 61 B.R. 567 (Bkrtcy.N.D.Tex.1986) (Chapter 11) (In this case, the court said if the bank had not held a valid, ripe right of setoff under Texas law the freeze would have been a violation of the stay.); and *In re Hoffman,* 51 B.R. 42 (Bkrtcy.W.D.Ark.1985) (Chapter 11), and did not consider in terms of Section 362(a)(3).

However, most cases holding a freeze was not a violation of the stay were pre–1984 amendment, including the following: *In re Edgins,* 36 B.R. 480 (9th Cir.BAP 1984) (Chapter 13); *Stann v. Mid–American Credit Union,* 39 B.R. 246 (D.Kan.1984) (Chapter 7); *Kenney's Franchise Corp. v. Central Fidelity Bank,* 22 B.R. 747 (D.W. D.Va.1982) (Chapter 11); *In re Owens–Peterson,* 39 B.R. 186 (Bkrtcy.N.D.Ga.1984) (Chapter 13); *In re Lee,* 40 B.R. 123 (Bkrtcy.E.D.Mich.1984) (Chapter 7); *In re Gazelle,* 17 B.R. 617 (Bkrtcy. W.D.Wisc.1982) (Chapter 11); and *In re Carpenter,* 14 B.R. 405 (Bkrtcy.M.D.Tenn.1981) (Chapter 7).

a violation of the stay. It is unquestionably an exercise of control over property of the estate.

The freeze issue is one in which various sections of the Bankruptcy Code—Sections 362, the automatic stay; 363, cash collateral; 506, secured claims; 542, turnover and 553, setoff, must frequently be considered together. The fact-sensitiveness of the individual cases has also contributed to the split in authority. The courts appear to have decided the cases on their individual merits based their individual facts. That is what this Court must do with the Patterson case.

The place to begin this analysis is by determining if the funds held by B.F. Goodrich Employees Federal Credit Union were the property of the bankruptcy estate. When a petition is filed in a bankruptcy case, an estate is created comprised of "all legal or equitable interests of the debtor", "wherever located and by whomever held...." 11 U.S.C. § 541(a). If the petition is filed under Chapter 13's wage-earner reorganization plan, the property also includes all property the debtor may acquire after commencement of the case but before its closing, dismissal or conversion to another chapter. 11 U.S.C. § 1306(a).

Thus a debtor's balances in credit union accounts are clearly property of the estate at the initiation of the case, whatever subsequent adjudication on the creditor's lien or the debtor's right to cash collateral there might be. The Pattersons' funds in any accounts with the Credit Union became property of the bankruptcy estate at the filing of the petition, whether the accounts were considered secured, unsecured or exempt.

Under 11 U.S.C. § 542(b), any entity which owes a debt which is the property of the bankruptcy estate must pay over the funds to the estate to the extent the funds are not subject to a valid right of setoff. If a creditor holds a valid right to setoff under applicable non-bankruptcy law, 11 U.S.C. § 553 generally validates such right providing that the claims involved are *mutual, both arose before the petition* and

the creditor's claim is not disallowed under Section 502.

As the Bankruptcy Court points out in *In re Drexel Burnham Lambert Group Inc.*, 113 B.R. 830 (Bkrtcy.S.D.N.Y.1990) (a Chapter 11 case):

The long established right to set off mutual pre-petition debts owed to and owed by a creditor in the same capacity has its roots in the recognition that setoff is but another form of secured financing to be recognized in bankruptcy. *In re Elcona Homes Corp.*, 863 F.2d 483, 485, 486, Bankr.L.Rep. (CCH) P. 72532 (7th Cir. 1988). "[I]t is a provision based on the generally recognized right of mutual debtors which has been enacted as part of the Bankruptcy [laws], and when relied upon should be enforced by the court." *Cumberland Glass Mfg. Co. v. DeWitt*, 237 U.S. 447, 455, 35 S.Ct. 636, 639, 59 L.Ed. 1042 (1915).

*Drexel Burnham Lambert* at 839.

Section 553(a) provides that:

".... this title [11 USCS Sections 101 et seq.] does not affect any right of to offset a <u>mutual</u> debt owing by such creditor to the debtor that arose <u>before the commencement of the case under this title</u> [11 USCS Sections 101 et seq.] against a claim of such creditor against the debtor that arose <u>before the commencement of the case</u> (underlining for emphasis)....

However, the right to impound funds under the claim of setoff is limited by the Bankruptcy Code:

The scope of the automatic stay is broad. It prohibits, among other things, any act to obtain possession of property belonging to the debtor's estate, any act to collect on a claim against the debtor that arose before the filing in bankruptcy, and any act to set off a debt owing to the debtor that arose before the filing. 11 U.S.C. § 362(a) (1979).

This last prohibition restrains a creditor from setting off a claim of the debtor against a debt owing to the creditor. That right is generally preserved in the Bankruptcy Code, which "does not affect any right of a creditor to offset a mutual

debt owing by such creditor to the debtor ..." 11 U.S.C. § 553 (1979). However, by the very terms of § 553, that right is limited by the automatic stay provisions of § 362. Thus, before a setoff can be made against the debts owed by a petitioner in bankruptcy, a creditor must seek relief from the automatic stay. Even setoffs effected before bankruptcy may be investigated and reviewed by the Bankruptcy Court. *Id.* §§ 553(a)(3) and (b)(1).

The Third Circuit in *Norton* at 771.

## B. THE AUTOMATIC STAY IS FUNDAMENTAL TO THE BANKRUPTCY PURPOSE AND ITS SCOPE IS SWEEPING.

█ The automatic stay provided in Section 362(a) is an essential foundation block of the bankruptcy rebuilding process for individuals and entities seeking the protection of the reorganization chapters of the Code. See *Norton* at 771; *Small Business Administration v. Rinehart*, at 168; *Reynolds* at 1006. It was Congress' intent in enacting Section 362 that this be so:

The automatic stay is one of the <u>fundamental</u> debtor protections provided by the bankruptcy laws. It gives the debtor a breathing spell from his creditors. It stops all collection efforts, all harassment, and all foreclosure actions. It permits the debtor to attempt a repayment or reorganization plan, or simply to be relieved of the financial pressures that drove him into bankruptcy. (underlining for emphasis)

H.R.Rep. No. 595, 95th Cong., 1st Sess. 340–41 (1977), U.S.Code Cong. & Admin. News 1978, pp. 5787, 6296, 6297.

## C. LIEN HOLDERS MAY NOT EXERCISE SETOFF WITHOUT MUTUALITY AND PRIOR ADJUDICATION.

█ B.F. Goodrich Employees Federal Credit Union sought to justify its actions by pointing to the statutory bases of liens in members' deposits and shares, including 12 U.S.C. § 1757(11) and *Ala.Code* § 5–17–14.

Section 1757(11) generally gives credit unions power to: "impress and enforce a lien upon the shares and dividends of any member, to the extent of any loan made to him and any dues or charges payable to him;"

*Ala.Code* § 5–17–14 provides:

The capital of a credit union shall consist of the payments that have been made to it by the several members thereof in shares. The credit union shall have a lien on the shares and deposits of a member for <u>any sum due</u> to the credit union from said member or for any loan endorsed by him. A credit union may charge an entrance fee as may be fixed by the bylaws; provided, that such entrance fee shall not exceed $1.00. (underlining for emphasis)

1. A valid lien does not equal a right to setoff without mutuality in Alabama.

The annotation to this section of the Alabama Code cites *Matter of Frederick*, 58 B.R. 56 (Bkrtcy.N.D.Ala.1986) as defining this section to mean:

Setoff and rule of mutuality would apply to <u>mutual</u> demands of debtors and credit union, where debtors had money on deposit with the credit union and also maintained a credit card account with an outstanding unpaid balance with it. (underlining for emphasis)

The real issue between the Credit Union and the Pattersons is not whether these statutes allow credit unions a general lien on the accounts of their borrowing customers—but whether the Credit Union *enforced* that lien via the substantive equivalent of setoff and other acts in violation of the automatic stay.

In *Matter of Frederick* cited above, Bankruptcy Judge Clifford Fulford's opinion notes that since Section 553(a) provides no definition of mutuality, the definition must be determined under state law. His opinion cites to *Atkinson v. Federal Deposit Ins. Corp.*, 635 F.2d 508 (5th Cir. 1981) for a distillation of Alabama state law on setoff:

It is a well settled rule of banking law that in order for a setoff to be valid, the cross demands between the bank and the

depositor or depositors must be "mutual."

*King v. Porter*, 230 Ala. 112, 160 So. 101 (1935); *First National Bank of Abbeville v. Capps*, 208 Ala. 207, 94 So. 109 (1922); *see* 68 A.L.R.3d 192. Those mutual demands must be "due from one party to the other in the same right." *First National Bank of Abbeville v. Capps*, 94 So. at 110. In other words, for the bank to set off a deposit against the unpaid balance of a loan (cross-demands), those competing claims must exist mutually between the same parties. (underlining for emphasis)

*Atkinson* at 511.

The Bankruptcy Court decision also cited *Rainsville Bank v. Willingham*, 485 So.2d 319 (Ala.1986), reaffirming the mutuality rule, to the effect that:

Citing *King v. Porter*, 230 Ala. 112, 160 So. 101 (1935), the Court (the Alabama Supreme Court) reaffirmed the mutuality rule. It reasoned that when a deposit is made to a banking account it becomes a debt to the customer; and, when the bank also loans money to the depositor, a mutual debt exists, and the bank may, when the loan matures, apply the money it owes the depositor towards the depositor's debt to the bank. (underlining for emphasis)

*Frederick* at 57.

The Bankruptcy Court held in *Matter of Frederick* that unresolved factual issues prevented the debtor from getting his summary judgment against the creditor, but that the rule of mutuality applied and applied in the same fashion to credit unions as it did to banks:

For purposes of this case, the Court finds, because of the general powers conferred on credit unions by *Code of Alabama*, 1975, Section 5–17–4, that setoff and the rule of *King v. Porter* apply to credit unions; and that the debts here are at least mutual based on the known facts of this case, abbreviated as they are. The demands are mutual and are

due from one party to another in the same right. (underlining for emphasis)

*Frederick* at 58.

That *King v. Porter* rule states simply: "It is a recognized principle that, in order to establish set-off, the cross-demands must be mutual; that is, due from one party to another in the same right." *King*, 160 So. at 104.

2. The Credit Union had no valid right of setoff at point of freeze.

█ It is true that the Pattersons owed money to the Credit Union at the point of the freeze on January 23, 1990. But no payments on the obligations were *due* to the Credit Union until February 10 of 1990. An outline of the dates demonstrates that there was nothing due at the time of the filing of the bankruptcy petition nor at the time of the purported freeze on January 23 and 24, 1990:

January 10, 1990—Due date of all loans. Repayment by payroll deduction on the tenth day of each month.

January 17, 1990—Chapter 13 petition proposing to pay 100 percent to unsecured creditors.

January 23, 1990—Letter advising of termination of services to the Debtors.

February 10, 1990—Next payment on loans due.

Consequently, under Alabama state law on setoff, the time was not ripe for the Credit Union to exercise setoff rights against the Pattersons based on 12 U.S.C. Section 1757(11), *Ala. Code* Section 5–17–14 or common law interpretations of lien rights on January 23, 1990 when it froze the accounts.

There can be little doubt that the Credit Union's action was a setoff, an attempt at enforcing its liens during the automatic stay. Indeed, that is what the parties designated the Credit Union's action when they agreed to the order recognizing that setoff after the fact in March of 1990. Of the time after the "freeze" but prior to adjudication, Creditor contends in its brief [8] that "No setoff occurs when a freeze is

8. Creditor's Reply Brief, Document 8, AP 90– 70032, at p. 14.

imposed because no debit is made to the debtors' account and no funds are applied."

However, the brief cites with approval three elements necessary to constitute a setoff as outlined in *In re Owens–Peterson*, 39 B.R. 186 (Bkrtcy.N.D.Ga.1984), in turn citing *Baker v. National City Bank of Cleveland*, 511 F.2d 1016 (6th Cir.1975):

> The act of setoff is not complete until three steps have been taken: (1) the decision to exercise the right, (2) some action which accomplishes the setoff and (3) some record which evidences the right of setoff has been exercised.

*In re Owens–Peterson* at 189.

In the Patterson case, the Credit Union notified the Pattersons of its intent, "froze" savings and checking accounts, "reduced" the balance of one of their loan accounts by the balance in their savings accounts, filed a proof of claim with this court listing a balance due that reflected the "reduction," and refused to honor checks based on the frozen account. Factually, that constitutes a setoff under the elements for such set out in Creditor's own brief.

## D. THE FREEZE VIOLATED THE AUTOMATIC STAY UNDER 11 U.S.C. § 362(a)(3), (4), (6), AND (7).

■ The Bankruptcy Court for the Southern District of New York noted in *Drexel Burnham Lambert* that to allow certain creditors to take unilateral action to "freeze" a debtor's accounts would thwart the public policy underpinnings of Section 362(a)'s automatic stay:

> In addition, it is clear under recent authoritative case law that a freeze of payments to a debtor-in-possession or trustee may not be unilaterally ordered by a creditor without court approval, at least in cases not involving bank deposits. The bankruptcy courts should not, therefore, modify the automatic stay to permit a freeze unless there is a pre-existing right of setoff. It would be anomalous indeed if the automatic stay, designed to protect debtors and creditors alike by protecting the property of the estate, should be modified to permit acts done by creditors in order to create allegedly mutual obligations. It is one thing to recognize pre-existing rights; it is another highly inequitable thing to permit the creation of new creditor rights post-petition through modification of the automatic stay. (underlining for emphasis)

*Drexel Burnham Lambert* at 846–47.

> 1. The Credit Union's impoundment of the Patterson accounts was an act to obtain possession of, or to exercise control over property of the estate in violation of Section 362(a)(3).

Since funds in the Pattersons' account were property of the estate at the commencement of the Chapter 13 case, the Credit Union violated Section 362(a)(3) by withholding the funds from the estate. As *In re Homan*, 116 B.R. 595 (Bkrtcy.S.D. Ohio 1990) points out:

> Indeed, perhaps the most fundamental problem with countenancing the freezing of the debtor's bank accounts before any judicial determination of the rights of the parties has been made is that it begs the critical question, assuming in advance the precondition of its validity. This position converts a bank's potential right of setoff into an allowed claim at the outset. The freeze is essentially an extra-judicial temporary restraining order. Similarly, in *New York City Shoes*, 78 B.R. at 431, the court noted that "allowing a bank to effect a setoff without any prior judicial determination of the legitimacy of its claims raises, in any event, questions about fundamental fairness and due process of law."

*Homan* at 603.

In *Homan*, the court found a credit union's "freeze" did not constitute a "setoff" under Ohio state law because of the technical lack of an accounting "debit" to the debtor's frozen account. Consequently, the action did not violate Section 362(a)(7) because no setoff had occurred, the court held.

However, it found that the freeze violated the stay under Section 362(a)(3) which prohibits "any act to obtain possession of property of the estate or of property from

the estate or to exercise control over property of the estate." As noted above, the words "or to exercise control over property of the estate" were added to the Code section in 1984 to clearly express Congress' intent that any act to control property of the estate was covered by the automatic stay. Since the contents of all the Pattersons' accounts clearly became property of the estate at the moment the petition was filed, surely the Credit union's subsequent "freeze" of the accounts is an "act to control property of the estate."

The *Homan* court's reasoning is persuasive on the issue of a "freeze" in the context of Section 362(a)(3):

> The assertion that a creditor, with a potential secured claim as a result of an alleged right to setoff, can, post-petition, freeze a debtor's account without the Bankruptcy Court's approval is inconsistent with the purposes and provisions of the Bankruptcy Code. The Bankruptcy Code interfaces with a wide variety of commercial and legal relationships. Invariably, this results in at least delay in exercise of otherwise available non-bankruptcy remedies and rights and, in some instances, the impairment or loss of otherwise available non-bankruptcy remedies and rights. These results, while understandably unsatisfactory to individual creditors, comprise a portion of the overall Congressional allocation of economic risks in connection with bankruptcy legislation. Congress placed the court at the vortex of bankruptcy proceedings and the provisions of the automatic stay are designed as the initial channels that regulate the flow of economic consequences, which, if left unchecked or diverted by extra judicial determinations, would drown a debtor's opportunity for a fresh start and destroy a creditor's opportunity to receive its hierarchically ordered claim to a pro rata share of the bankruptcy estate.

*Homan* at 603.

B.F. Goodrich Employees Federal Credit Union's freeze of the Pattersons' accounts and services put the cart before the horse. For it was a unilateral determination by the Creditor alone that its lien was valid, and the actions did create an interest superior to both that of the bankruptcy estate and of other creditors. The fact that the parties to this adversary proceeding agreed to the authorization of setoff on the savings account in March does not cure the Credit Union's violation of the stay in January. Nor does it cure the seriously flawed policies that apparently underlie these actions. For B.F. Goodrich Employees Federal Credit Union usurped the role Congress has reserved for the Bankruptcy Courts.

2. The Credit Union's actions—the freeze, refusal of service, returned checks, offer of renewed service for concessions in the bankruptcy reorganization—constitute actions to enforce liens in violation of 11 U.S.C. § 362(a)(4) and to collect, assess or recover a claim against the Pattersons that arose before bankruptcy, in violation of 11 U.S.C. § 362(a)(6).

The code sections cited by the Credit Union itself deal with state and federal law creating liens in the accounts of credit union shareholders, liens the Credit Union enforced via its freeze in violation of Section 362(a)(4). That code section prohibits "any act to create, perfect, or enforce any lien against property of the estate" during the stay.

Furthermore, the Debtor's testimony that Mr. Phillips pressured him to make the Credit Union obligation non-plan, in light of all the circumstances at the time (frozen funds, not sufficient funds checks, threatened termination of services) must be construed as the sort of attempt to collect on a prepetition debt that is banned by Section 362(a)(6). That code section prohibits "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title".

In the factually similar *In re Guinn*, 102 B.R. 838 (Bkrtcy.N.D.Ala.1989), the Bankruptcy Court found that a credit union violated the stay under Section 362(a)(6) when, in an attempt to coerce a Chapter 7 debtor into paying certain unsecured debts, it ter-

minated the debtor's membership in the credit union, refused to accept debtor's payments on a real estate mortgage and subsequently declared the mortgage in default (because it had refused the debtor's attempted payment).

3. The Credit Union's impoundment of the savings account was, in fact, a setoff in January, which was forbidden by Section 362(a)(7), and not excepted from Section 362(a)(7) by Section 553(a).

■ Even when the holder of a ripe right of setoff delays exercise of its right until after bankruptcy has been filed, Section 362(a)(7) prohibits setoff without court permission. *Small Business Administration v. Rinehart* at 168–69; *Norton* at 771; *In re Julien Co.*, 116 B.R. 623 (Bkrtcy.W.D. Tenn.1990); *In re Homan*, 116 B.R. 595 (Bkrtcy.S.D.Ohio 1990); *In re Cloverleaf Farmer's Co-Op*, 114 B.R. 1010 (Bkrtcy.D. S.D.1990); *In re Sluss*, 107 B.R. 599 (Bkrtcy.E.D.Tenn.1989); *In re Communicall Cent., Inc.*, 106 B.R. 540 (Bkrtcy.N.D. Ill.1989); and *In re Charter Co.*, 103 B.R. 302 (Bkrtcy.M.D.Fla.1989).

For the reasons discussed above, B.F. Goodrich Employees Federal Credit Union did not have a valid right of immediate setoff at the point this petition was filed in January of 1990. Thus the Credit Union's January action was a premature exercise of setoff rights, an action against the debtor that was not excepted from the setoff prohibition of Section 362(a)(7) by the exception of Section 553(a). For there was no prepetition mutuality of obligation between the two parties to invoke Section 553(a), even had Creditor properly petitioned the Court to do so.

The issue of the contents of the savings account became moot in March due to the agreement of the parties to an order allowing the Credit Union to keep the funds. However, the Credit Union's action to impound funds prior to Court permission, as well as other actions and communications in the "freeze" of services to the Pattersons, are still before the Court.

The United States District Court for the Middle District of Alabama did hold in *Rio v. Army Aviation Center Federal Credit Union*, 82 B.R. 138 (D.M.D.Ala.1986) that imposition of an "administrative hold" on debtors' account by a credit union did not violate the automatic stay. However, that holding involved debtors who were in default on obligations to the credit union at the time their petition was filed, entitling the creditor to setoff under Alabama law and thus to the exception of Section 553(a). In the Patterson case, there was no prepetition obligation due or any default to activate the setoff exception.

Whatever the semantics of the matter, the substance of the transactions between the Credit Union and the Pattersons regarding the $882.78 (later determined to be only $668.24 by the Credit Union in its claim, listed as $643.16 in this Court's March order) savings and other account and services, was to exercise control over funds, to enforce liens and to otherwise seek to collect on prepetition obligations.

Then, as Creditor's brief said, the Credit Union "reduced" a $922.52 loan to the $254.28 for which the Credit Union filed proof of claim with this court. Additionally, in its "freeze" of the Patterson accounts, it returned checks for insufficient funds when Creditor testified normal procedure would have been to use funds from the savings account to cover such.

There is nothing else to call the January transactions but a setoff and exercise of control over interests of the estate—enforced in violation of Section 362 and of Alabama law.

4. For the reasons stated above, it is clear that the Credit Union violated the automatic stay of Section 362(a).

Because the Credit Union acted to exercise control over interests which were property of the bankruptcy estate prior to any adjudication of the issue, it violated 11 U.S.C. § 362(a)(3). Because the Credit Union admittedly was attempting to enforce liens it held in debtors' funds prior to Court authorization, it violated 11 U.S.C. § 362(a)(4). Because the Credit Union's

freeze and request that its obligation be made non-plan can be deemed an attempt to collect on a prepetition debt, it violated 11 U.S.C. § 362(a)(6). Because the Credit Union's January actions substantively constituted a setoff, it violated 11 U.S.C. § 362(a)(7). Because the Credit Union held no valid prepetition right of setoff under Alabama law, the exception to 11 U.S.C. § 362(a)(7) provided by 11 U.S.C. § 553(a), did not apply.

## II.

### THE CREDIT UNION'S ACTION IS DISCRIMINATION IN VIOLATION OF SECTION 525

#### A. THE CREDITOR TESTIFIED THE PATTERSONS' ACCOUNTS AND SERVICES WERE "FROZEN" SOLELY BECAUSE OF THEIR BANKRUPTCY.

■ The Pattersons contend that the B.F. Goodrich Employees Federal Credit Union denied them services, refused their deposits, returned their checks and took control of their savings account solely because of their bankruptcy, in violation of 11 U.S.C. § 525.

On Creditor's side of the case there is a paradox in Creditor's own evidence. The brief in the case contends that the Credit Union had a legal right to do what it did because it would take the same actions against any member who caused the Credit Union a loss. The brief contends that the actions were not taken against the Pattersons solely because of their bankruptcy.

However, at the confirmation hearing, the Creditor's main witness, Mr. Phillips, manager of the Credit Union, testified that the Pattersons had never caused the Credit Union a loss and that furthermore, the bankruptcy filing was the *only* reason for the "freeze."

#### B. CONGRESS INTENDED TO FORBID DISCRIMINATION IN MANY GUISES WITH 11 U.S.C. § 525.

■ Section 525 of 11 U.S.C. was enacted in 1978 to eliminate a wide variety of forms of discrimination against bankrupt debtors by government agencies and activities. In what is now Section 525(a), many of those activities are specifically enumerated. Specific references in 525(a) prohibit governmental agencies from discriminating in acts to:

> deny, revoke, suspend or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, deny employment to, terminate the employment of, or discriminate with respect to employment against, a person that is or has been a debtor under this title [11 U.S.C. Sections 101 et seq.] or a bankrupt or a debtor under the Bankruptcy Act or another person with whom such bankrupt or debtor has been associated, solely because such bankrupt or debtor is or has been a debtor under this title. . . .

The legislative history for Section 525(a) would indicate that the law should be read expansively to forbid discrimination in many different guises. Congressional committee reports of the time said:

> In addition, the section is not exhaustive. The enumeration of various forms of discrimination against former bankrupts is not intended to permit other forms of discrimination. The courts have been developing the Perez (*Perez v. Campbell*, 402 U.S. 637, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971)) rule. This section permits further development to prohibit actions by governmental or quasi-governmental organizations that perform licensing functions such as a State Bar association or a medical society, or by other organizations that can seriously affect the debtors' livelihood or fresh start, such as exclusion from a union on the basis of discharge of a debt to the credit union. The effect of the section, and of further interpretations of the Perez rule, is to strengthen the anti-reaffirmation policy found in section 524(b). Discrimination based solely on nonpayment could encourage reaffirmations, contrary to the expressed policy.
>
> The section (the original 1978 Section 525 which applied only to government or qua-

si-governmental entities) is not so broad as a comparable section proposed by the Bankruptcy Commission, § 236, 94th Cong., 1st Sess Section 4–508 (1975), which would have extended the prohibition to any discrimination, even by private parties. Nevertheless it is not limiting either, as noted. The courts will continue to mark the contours of the antidiscrimination provision in pursuit of sound bankruptcy policy. (underlining for emphasis)

H.R.Rep. No. 595, 95th Cong., 1st Sess. 366–67 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 81 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5867, 6323.

## C. THE PROTECTIONS OF SECTION 525(b) CLEARLY EXTEND TO CREDIT UNIONS.

■ In 1984, Congress did extend the ban on discrimination due to bankruptcy to the private sector with the addition of 11 U.S.C. § 525(b).

Section 525(b) provides almost no specific enumeration of examples of discrimination:

No private employer may terminate the employment of, or discriminate with respect to employment against, an individual who is or has been a debtor under this title, a debtor or bankrupt under the Bankruptcy Act, or an individual associated with such debtor or bankrupt, solely because such debtor or bankrupt—

(1) is or has been a debtor under this title or a debtor or bankrupt under the Bankruptcy Act;

(2) has been insolvent before the commencement of a case under this title or during the case but before the grant or denial of a discharge; or

(3) has not been paid a debt that is dischargeable in a case under this title or that was discharged under the bankruptcy act. (underlining for emphasis)

It is Section 525(b)(1) and (3) that primarily concern us here. While there is little case law specifically applying Section 525 in the credit union context, it is obvious that Congress' intent was that the law should be read expansively to cover discrimination in a broad array of benefits offered by/affiliated with an employer—as it intended in the public sector with the initial phase of the law.

The legislative history above gives a clear indication that Congress intended the courts to do exactly as it says: "to mark the contours of the antidiscrimination provision in pursuit of sound bankruptcy policy." Indeed, that history directs that even then Congress intended that certain private organizations such as State bar associations, or medical societies would be covered by the antidiscrimination law as well as "other organizations that can seriously affect the debtors' livelihood or fresh start, such as exclusion from a union on the basis of discharge of a debt to the UNION'S CREDIT UNION." (underlining for emphasis).

Additionally, the text of Section 525(b) lends itself to an expansive interpretation of its protections. For it forbids private employers to terminate workers or to "discriminate with respect to employment against" (underlining for emphasis) an individual who has been a debtor under federal bankruptcy laws. Consequently, it seems clear that credit unions, as closely affiliated with a certain company as is B.F. Goodrich Employees Federal Credit Union with Uniroyal, are covered by Section 525(b).

Both Debtors and Creditors cite *In re Callender,* 99 B.R. 378 (Bkrtcy S.D.Ohio 1989) and *In re Brown,* 95 B.R. 35 (Bkrtcy E.D.Va.1989) in their briefs. Both cases deal with situations in which a credit union took action against a debtor in bankruptcy (in Chapter 13, in *Callender;* Chapter 7, in *In re Brown* ). Although neither case constitutes binding authority on this court, certain themes in both bear repeating. Both, however, are factually distinguishable from the Pattersons' in the critical area—whether the credit union took its action *solely* because of the bankruptcy.

Contrary to the narrow view urged in Creditor's brief[9], *In re Brown* states the

---

9. Creditor contends in its Reply Brief at P. 21 that Section 525(b) would not apply because the Pattersons were neither "discriminated against

solely because of bankruptcy, nor has the Debtor been terminated by the Credit Union."

correct construction of the coverage of Section 525 generally:

> One of the benefits of her employment (the plaintiff's) is membership in the Newport News Educators Credit Union. To deny her access to *all* credit union services clearly does "discriminate with respect to employment." Such a policy would bar not just future loans, but maintaining savings and checking accounts.

The legislative history is clear:

> "In addition, the section is not exhaustive. The enumeration of various forms of discrimination against former bankrupts is not intended to permit other forms of discrimination."
> House Report No. 95–595,
> 95th Cong., 1st Sess.
> 366–7 (1977);
> Senate Report No. 95–989,
> 95th Cong., 2d Sess.
> 81 (1978), U.S.Code Cong. & Admin. News 1978, p. 5787.[10]

*In re Brown* at 37.

The court in *In re Brown* refused to approve the reaffirmation sought by the credit union because it found such would jeopardize the debtor's "fresh start". It permanently enjoined the Newport News Educator's Credit Union from use or enforcement of any policy which in any manner discriminates against members solely on the grounds of having filed bankruptcy. The court noted that the credit union would not be forced to grant loans to "deadbeats" but "... it may *not* discriminate on the sole grounds of bankruptcy."

Nor did the court in *Callender* doubt that Section 525(b) applied to credit union privileges and not just discrimination in hiring and firing:

> Credit unions, as is true of the Credit Union here involved, commonly have an affiliation with a particular employer, in this case the United States Postal Service. Their services are offered to, and limited to, employees of a particular employer. The term "employer" in the present context should be given a broad

reading, not bound by conventional state law concepts.
*Callender* at 380.

The court in *Callender* found that the credit union applied its policy across the board to all members and therefore the type of discrimination present in the *Callender* fact situation was not barred by Section 525(b).

In *Brown v. Pennsylvania State Employees Credit Union*, 851 F.2d 81 (3rd Cir.1988), the Court of Appeals ruled that a credit union's policy denying future services to a Chapter 7 debtor was not a violation of the automatic stay under Section 362(a)(6) or a prohibited attempt to collect a discharged obligation in violation of Section 524(a)(2). In that case, the appeals court was reversing both the Bankruptcy Court and the United States District Court for the Middle District of Pennsylvania on holdings on these code sections.

(As far as the Section 362(a)(6) automatic stay issue is concerned, *Brown* is factually distinguishable from the Patterson case. The Pattersons' Chapter 13 plan is for 100 percent repayment, unlike the *Brown* Chapter 7 liquidation. Additionally, the credit union in *Brown* denied services to bankrupts who had failed to repay loans just as it did non-bankrupts who failed to repay loans. The Pattersons had not failed to repay a loan. According to the Creditor's testimony, they were treated differently than other members in good standing because of their bankruptcy.)

On the discrimination issue, it is most significant that this frequently-cited Pennsylvania case was decided under pre–1984 law: before Congress enacted 11 U.S.C. Section 525(b) to extend the anti-discrimination provision to private entities.

The Bankruptcy Court in *Brown* had held, a finding the appeals court did little more than mention, that the facts did not constitute (pre–1984) Section 525 discrimination because the credit union was a private entity. The lower court simply held that Pennsylvania State Employees Credit Union was not a "governmental unit" as defined by Section 101(24) and that the

---

**10.** As cited in *In re Brown*, 95 B.R. 35, 37.

discrimination ban of Section 525 as it then existed applied only to governmental units. That, however, is no longer the law.

When the *Brown* court said at 851 F.2d at 85: "Nothing in the bankruptcy code requires this creditor to do business with this debtor," it referred to the pre–1984 code which did not contain Section 525(b). Section 525(b) can now require such a result when employment-affiliated benefits are denied solely based on bankruptcy.

### D. THE CREDIT UNION VIOLATED SECTION 525(b) WHEN IT FROZE ACCOUNTS AND HALTED SERVICES TO THE PATTERSONS SOLELY DUE TO THEIR BANKRUPTCY.

The Pattersons were described by the manager of the Credit Union as members in good standing who had never caused the credit union a loss. To say that the single fact of their filing a Chapter 13 petition is a "loss" which can cost them the services of their Credit Union without any other delinquency alleged is to define the elements of the discrimination forbidden under Section 525(b).

B.F. Goodrich Employees Federal Credit Union's representative has said in testimony that its policy is to freeze services and accounts for no more cause than notice of a member's bankruptcy filing. That is a casebook example of the sort of discrimination Congress outlawed when it enacted Section 525(b).

### CONCLUSION

Applying the law to the clear-cut fact pattern in this case requires B.F. Goodrich Employees Federal Credit Union to cure its violation of the Section 362(a) automatic stay and the discrimination it has practiced against the Pattersons in violation of Section 525(b).

The Credit Union must restore the services the Pattersons are due as members by releasing to them any funds still held in a "freeze" of the accounts in violation of Sections 362(a) and 525(b) (other than those funds to which the Debtor has already accepted setoff), and by providing them with all rights and benefits available to members in good standing. Furthermore, the Credit Union must compensate them for reasonable costs, including attorneys fees, caused by the "freeze" and any service charges on insufficient funds checks for which they have not already been reimbursed. The Pattersons are also due damages assessed for the inconvenience of the illegal "freeze".

This memorandum shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052. A separate order will be entered consistent with this opinion.

DONE AND ORDERED.

### ORDER GRANTING DEBTORS' MOTION TO RESTRAIN CREDITOR

This matter came before the Court on the Debtors' February 8, 1990 motion to restrain Creditor B.F. Goodrich Employees Federal Credit Union from closing accounts held by Debtors at the financial institution and to award Debtors costs incurred because of the Creditor's actions.

The Court, having considered all the evidence, the arguments of counsel and the applicable law, finds the Debtors' motion is due to be GRANTED. It is by the Court

ORDERED, ADJUDGED AND DECREED:

1. That Creditor, B.F. Goodrich Employees Federal Credit Union, repay to the Pattersons the sum of $40 charged to them for checks returned for insufficient funds because of the Creditor's refusal to accept their deposits, if this amount has not already been reimbursed;

2. That B.F. Goodrich Employees Federal Credit Union is hereby restrained and enjoined from denying to the Pattersons any of the services and privileges accorded to other members in good standing of the Credit Union solely because of their bankruptcy;

3. That the Credit Union is restrained and enjoined from enforcing any policy of "freeze" of accounts and services and/or revocation or alteration of services to the

Pattersons or other members solely because of a bankruptcy filing under Title 11 of the United States Code;

4. That the Credit Union shall pay to the Pattersons the reasonable costs, including attorneys' fees and expenses of pursuing this adversary proceeding, such amount to be determined in a separate hearing at a later time;

5. That the Credit Union shall pay to the Pattersons damages assessed at $200 for the inconvenience and expense caused to them by the Credit Union's actions since their filing of the bankruptcy proceeding January 17, 1990.

DONE AND ORDERED.