967 F.2d 505
 61 USLW 2084, 27 Collier Bankr.Cas.2d 475,
23 Bankr.Ct.Dec. 407,
Bankr. L. Rep. P 74,766
 In re: Fred C. PATTERSON, Jr., Mary Patterson, Debtors.
B.F. GOODRICH EMPLOYEES FEDERAL CREDIT UNION, Plaintiff-Appellant,
v.
Fred C. PATTERSON, Jr., Mary L. Patterson, Defendants-Appellees,
C. Michael Stilson, Trustee.
 No. 91-7669.
 United States Court of Appeals,
Eleventh Circuit.
 July 29, 1992.
 
 1
 Carleton P. Ketcham, Jr., Birmingham, Ala., for plaintiff-appellant.
 
 
 2
 Annette Crain, Tuscaloosa, Ala., for defendants-appellees.
 
 
 3
 Melinda Murphy Dionne, Schoel, Ogle, Benton, Gentle & Centeno, Birmingham, Ala., for Trustee.
 
 
 4
 Appeal from the United States District Court for the Northern District of Alabama.
 
 
 5
 Before TJOFLAT, Chief Judge, ANDERSON, Circuit Judge and ALAIMO*, Senior District Judge.
 
 ALAIMO, Senior District Judge:
 
 6
 This case presents an issue of first impression: whether a credit union, upon receiving notice of a bankruptcy filing by its members, violates the automatic stay provisions of 11 U.S.C. § 362(a) and the anti-discrimination provisions of 11 U.S.C. § 525, when it freezes the members' accounts, files a proof of claim that shows a loan balance reduced by a savings account balance, and suspends credit union services to the members. The bankruptcy court held that the credit union violated those sections of the bankruptcy code, Patterson v. B.F. Goodrich Employees Federal Credit Union (In re Patterson), 125 B.R. 40 (Bankr.N.D.Ala.1990), and the district court affirmed. The credit union appeals. We affirm.
 
 I. FACTS AND PROCEDURAL HISTORY
 
 7
 Fred C. Patterson worked at UniRoyal Goodrich in Tuscaloosa, Alabama. Mr. Patterson's employment at UniRoyal Goodrich entitled him to apply for membership in the B.F. Goodrich Employees Federal Credit Union (the "Credit Union"). Mr. Patterson and his wife, Mary L. Patterson, joined the Credit Union when Mr. Patterson began his employment at UniRoyal Goodrich. The Pattersons maintained a share account ("savings account") and a share draft account ("checking account") with the Credit Union. The Pattersons also were indebted on a loan from the Credit Union. The promissory note on that loan provides that the Pattersons' checking and savings accounts serve as security for the loan. The Pattersons make payments on the loan through a payroll deduction on Mr. Patterson's paycheck. The loan payments are due on the tenth of each month.
 
 
 8
 On January 17, 1990, the Pattersons filed a bankruptcy petition under Chapter 13 of the United States Bankruptcy Code (the "Code"). After the Credit Union received notice of the Pattersons' bankruptcy filing, it responded, on January 23, 1990, by blocking any activity in the Pattersons' accounts. The Credit Union refers to this action as an administrative freeze. The Credit Union took this action because its loan to the Pattersons was secured by these accounts and the outstanding loan balance exceeded the balance in the accounts. As a result of this freeze, the Credit Union dishonored checks drawn on the Pattersons' checking account and prevented the Pattersons from making deposits to cover these dishonored checks.[1] The Credit Union also suspended all services to the Pattersons so they could not cash checks. The Credit Union notified the Pattersons of this action in a letter that reads: "due to the fact that you have filed a Bankruptcy, the credit union will cease deposit to or withdrawal from your accounts." Patterson, 125 B.R. at 42.
 
 
 9
 The manager of the Credit Union, James P. Phillips, testified that the Credit Union's letter was sent in response to the Pattersons' bankruptcy filing. Mr. Patterson questioned Phillips about the administrative freeze. Phillips informed Mr. Patterson that the policy of the Credit Union's Board of Directors is that the Credit Union stops all services to a member who causes the Credit Union a loss. Phillips testified, however, that the Credit Union had not suffered a loss due to the Pattersons as of January 23, 1990. In another conversation, Phillips told Mr. Patterson that credit union services would be restored "if he would reaffirm his debt to the Credit Union or make the obligation non-plan." Patterson, 125 B.R. at 43.
 
 
 10
 The Credit Union filed a proof of claim with the bankruptcy court on January 25, 1990. In paragraph 5 of the proof of claim, the Credit Union stated that "No security interest is held for this claim except: $668.24 in a deposit in which claimant has a lien, which will be applied at an appropriate time and is deducted below." In paragraph 7 of the proof of claim, the Credit Union calculated the amount of its claim as follows:
 
 
 11
 Principal Amount $922.52
Interest or Finance Charge
Additional Charges
TOTAL 922.52
 ---------
 Less Credits on Account $ 668.24
Present Amount Due $ 254.28.
 ---------
 ---------
 
 
 12
 In late January and early February of 1990, the Pattersons filed two adversary proceedings against the Credit Union. First, the Pattersons requested a turnover of funds frozen by the Credit Union. Second, the Pattersons moved for an injunction restraining the Credit Union from closing their accounts. The Credit Union responded that its actions were proper because it had no other adequate protection to preserve its secured interest in the Pattersons' accounts and because the Pattersons had no equity in the accounts based on common law and contractual and statutory liens. Furthermore, the Credit Union asserted that its actions were not in violation of the automatic stay provisions of 11 U.S.C. § 362 ("Section 362"), and the anti-discrimination provisions of 11 U.S.C. §§ 524 and 525 ("Section 524" and "Section 525"). The Credit Union also included in its response a motion to lift the stay in order to apply the assets in the frozen accounts to the Pattersons' loan obligation. While the motions were under consideration, the Pattersons consented to the Credit Union's motion for relief from the automatic stay and withdrew their motion for turnover of funds. Thereafter, the Credit Union was free to reduce its outstanding loan balance, pursuant to the Court's order of March 23, 1990.
 
 
 13
 On October 5, 1990, the bankruptcy court granted the Pattersons' motion to restrain the Credit Union and awarded damages and attorney's fees to the Pattersons and against the Credit Union for violating the automatic stay and wrongfully discriminating against the Pattersons. The Court denied the Credit Union's later motion to alter or amend. The Credit Union then appealed to the United States District Court for the Northern District of Alabama, which affirmed the bankruptcy court.
 
 II. DISCUSSION
 
 14
 We review findings of fact of the bankruptcy court under the clearly erroneous standard. Club Assocs. v. Consolidated Capital Realty Investors (In re Club Assocs.), 951 F.2d 1223, 1228 (11th Cir.1992). The bankruptcy and district courts' conclusions of law are subject to de novo review by this court. Id.
 
 A. The Automatic Stay
 
 15
 The bankruptcy court held, and the district court affirmed, that the Credit Union's administrative freeze violated the automatic stay of Section 362(a). The Credit Union argues that a freeze merely protects its right of setoff, which is explicitly preserved under separate provisions of the Code and, therefore, does not violate the automatic stay. This argument attacks the very foundation of the bankruptcy court's holding but is flawed in several aspects. We address this argument first. We then review the findings of the courts below that the freeze violates specific subsections of Section 362(a).
 
 
 16
 1. The Right of Setoff Under the Code.
 
 
 17
 Setoff is an established creditor's right to cancel out mutual debts against one another in full or in part. The purpose of setoff is to avoid "the absurdity of making A pay B when B owes A." Studley v. Boylston Nat'l Bank, 229 U.S. 523, 528, 33 S.Ct. 806, 808, 57 L.Ed. 1313 (1913). The Code explicitly preserves the right of setoff. 11 U.S.C. § 553 (1988) ("Section 553").[2] Section 553 does not create a right of setoff, however. E.g., In re Saugus Gen. Hosp., Inc., 698 F.2d 42, 44-45 (1st Cir.1983); see generally 4 Collier on Bankruptcy p 553.06 (15th ed. 1992). Substantive law, usually state law, determines the validity of the right. Id.
 
 
 18
 The right of setoff is not absolute. The right preserved under Section 553 is limited by its own language to the provisions of the automatic stay in Section 362. In order to exercise a valid right of setoff, a creditor must move the court for relief from the stay pursuant to the provisions in Section 362(d). The decision whether to lift the stay lies in the sound discretion of the bankruptcy court. Small Business Admin. v. Rinehart, 887 F.2d 165, 169 (8th Cir.1989).
 
 
 19
 The Code affords two concomitant rights to a creditor possessing a valid right of setoff. First, the creditor's claim is secured to the extent of the amount subject to setoff. 11 U.S.C. § 506(a) (1988). Second, the Code provides an exception to the general turnover requirement that "an entity that owes a debt that is property of the estate ... shall pay such debt to ... the trustee...." 11 U.S.C. § 542(b) (1988).
 
 
 20
 2. The Credit Union's Right of Setoff.
 
 
 21
 The Credit Union argues that a freeze does not violate the automatic stay because the Code preserves a valid right of setoff, which would be an empty right if the Pattersons were allowed to draw down the account, thereby destroying the Credit Union's security on its claim for the outstanding loan. For the sake of argument, we assume that a freeze is not a setoff, per se, an explicit violation of Section 362(a)(7).[3] Notwithstanding this assumption the argument fails for several reasons. First, the argument presupposes a valid right of setoff, which the Credit Union did not possess when it froze the accounts. Next, the fact that the Credit Union did not have a valid right of setoff highlights the fallacy inherent in a freeze: it allows the bank to avoid or delay the Code-mandated determination on the validity of the setoff right. Finally, the Credit Union's argument implies that it has no other legitimate means to protect its security interest, despite provisions in the Code to the contrary.
 
 
 22
 In preserving the right of setoff, Section 553 requires that the obligation between the debtor and creditor arose before filing the bankruptcy petition and that mutuality of obligation exists. See Section 553. The bankruptcy court held, and the district court affirmed, that the Credit Union did not possess a valid right of setoff in this case because mutuality of obligation between the Pattersons and the Credit Union was not present. We agree.
 
 
 23
 The contours of the right of setoff are determined by non-bankruptcy law.[4] Thus, whether mutuality of obligation was present is an issue of Alabama law because Section 553 requires, but does not define, mutuality. See Frederick v. America's First Credit Union (In re Frederick), 58 B.R. 56 (Bankr.N.D.Ala.1986). Mutuality is present under Alabama law when cross demands are "due from one party to the other in the same right." King v. Porter, 230 Ala. 112, 160 So. 101, 104 (1935); accord First National Bank of Abbeville v. Capps, 208 Ala. 207, 94 So. 109, 110 (1922). Citing this early precedent, the Supreme Court of Alabama recently summarized a bank's argument for setoff as follows:
 
 
 24
 A bank customer's deposit in a banking account becomes a debt from the bank to the customer. When the bank also lends money to the depositor, mutual debts exist, and the bank may, when the loan matures, apply the money it owes the depositor towards the depositor's debt to the bank.
 
 
 25
 Rainsville Bank v. Willingham, 485 So.2d 319 (Ala.1986) (emphasis added). Mutuality of obligation in Alabama, therefore, requires that the cross demands are between parties of like capacity and that the demands are mature at the time of setoff.
 
 
 26
 There is no question in this case that the cross demands are between parties of like capacity, the Pattersons and the Credit Union. However, the Pattersons' debt to the Credit Union was not mature when the Credit Union froze the accounts. The Patterson's loan payments were due to the Credit Union on the tenth of each month. The Pattersons had not failed to make a payment on this loan when the Credit Union froze their account on January 23, 1990. Thus, mutuality of obligation as defined by Alabama law was not present on January 23 on the cross demands of the Credit Union and the Pattersons. Hence, the Credit Union did not have a valid right of setoff on that date.[5]
 
 
 27
 Even if the Credit Union had a valid right of setoff, freezing the account under the guise of protecting this right is contrary to the policy of the Code. Section 553 preserves the right to setoff only to the extent that the right is valid. Elsewhere, the Code sets forth the procedure for the bankruptcy court to determine the validity of the right.[6] Under this framework, freezing the account to protect a valid right of setoff only begs the question whether the right is truly valid. See Homan v. Kemba Cincinnati Credit Union (In re Homan), 116 B.R. 595, 603 (Bankr.S.D.Ohio 1990). The freeze is a unilateral, extrajudicial determination by the creditor that the setoff right is valid. See id. By providing a procedure for judicial determination, the Code eschews such creditor self-help. The present case illustrates the inherent flaw in the freeze as a means to protect a valid right to setoff. The Credit Union unilaterally made this determination; however, it was an erroneous determination because the Credit Union's right of setoff had not yet ripened.
 
 
 28
 The Credit Union's underlying concern is not frivolous, however. The Credit Union froze the Pattersons' accounts to avoid paying the Pattersons' checks, which would dissipate the Credit Union's collateral on its loan to the Pattersons. If the Credit Union's right to setoff were later determined valid, and if the funds in the account had been disbursed to payees, then the Credit Union's right to setoff would indeed be an empty right. See In re Edgins, 36 B.R. 480, 484 (9th Cir. BAP 1984) ("This will, all too often, be an attempt to lock the barn door after the horse has been stolen."). The Credit Union argues that the freeze should be permitted because it is the only means to prevent this scenario. We disagree.
 
 
 29
 Creditors in this position have an alternative remedy and need not freeze debtors' accounts. The creditor may file an ex parte motion pursuant to Sections 362(f) or 363(e) and accompany this motion with the funds from the debtor's account to be paid into the registry of the bankruptcy court. This approach strikes the proper balance between the parties' interests. The creditor is protected from the risk that funds will be insufficient or unavailable to satisfy a later-determined valid right of setoff. The debtor is protected from the risk that a creditor will unilaterally deny the debtor access to funds in which the creditor does not have a valid right of setoff.
 
 
 30
 This procedure will occur rather quickly. The banking institution is presented with its dilemma when a check is presented for payment. The institution realizes that it cannot dishonor the check unless the institution has a valid right of setoff in the funds from which payment would be made. The institution is under an abnormal time constraint after a check is presented. Under normal circumstances, the institution would defer to the bankruptcy court's determination, in due course, of the validity of the setoff right. When a check is presented, however, the institution must make the determination whether to honor the check before midnight of the next banking day after it receives the check. See Ala.Code § 7-4-104(1)(h) (1975) (the "midnight deadline rule"). The midnight deadline rule provides the institution a small window in which to make its ex parte motion to the bankruptcy court. Nevertheless, this window is an alternative to the freeze, does not violate the automatic stay, and is readily available to banks in this predicament. For the foregoing reasons, we affirm the holding of the courts below that the Credit Union's freeze of the Pattersons' accounts was not justified by the Code sections that preserve a creditor's right of setoff.
 
 
 31
 3. Violation of the Automatic Stay.
 
 
 32
 The bankruptcy court found that the Credit Union violated the automatic stay, Section 362(a). Specifically, the court found violations of subsections (3), (4), (6), and (7) of Section 362(a).[7] The district court affirmed, finding violations of Section 362(a), subsections (3), (4), and (7), but did not address the bankruptcy court's finding under Section 362(a)(6). We affirm.
 
 
 33
 The Credit Union's freeze constituted an act to exercise control over the property of the bankruptcy estate in violation of Section 362(a)(3). The funds in the Pattersons' accounts became property of the estate when the Pattersons filed for bankruptcy.[8] On January 23, 1990, the Credit Union froze the Pattersons' accounts and refused to pay checks from those funds after that date. Although the Credit Union had possession of the funds on deposit prior to the freeze, dispersal of those funds was subject to the Pattersons' order. The act of freeze deprived the Pattersons of any control over those funds and invested exclusive control in the Credit Union. Such conduct violates the express terms of Section 362(a)(3). See Homan v. Kemba Cincinnati Credit Union (In re Homan), 116 B.R. 595, 602 (Bankr.S.D.Ohio 1990); In re First Conn. Small Business Inv. Co., 118 B.R. 179, 181 (Bankr.D.Conn.1990); In re Wildcat Constr. Co., 57 B.R. 981, 984 (Bankr.D.Vt.1986).
 
 
 34
 Since Section 362(a)(3) contains such broad sweeping language, its application to this situation is subject to criticism. For example, one commentator objects to cases holding that a freeze violates this section on the basis that a broad interpretation of that section "can swallow whole many provisions in the Code that protect creditors." Williams, supra note 3. This criticism does not apply to our holding today, which strikes a balance between the interests of debtor and creditor. In contrast to the freeze, which constitutes an act of control over the account, paying the funds into the registry of court with an accompanying expedited motion is an abdication of control by the creditor in favor of the bankruptcy court's determination of the disposition of the funds. This solution gives effect to the broad statutory language of Section 362(a)(3) and strikes an appropriate balance between the interests of debtor and creditor.[9]
 
 
 35
 The Credit Union's freeze also violated the automatic stay as an act to enforce a lien against property of the estate. See Section 362(a)(4). Alabama law gives a credit union "a lien on the shares and deposits of a member for any sum due to the credit union from said member or for any loan endorsed by him." Alabama Code § 5-17-14 (1975). The Credit Union has argued, and we have discussed, the Bankruptcy Code's preservation in Section 553 of the Credit Union's state-law right to set off the Pattersons' debt. Our decision today makes clear that the provisions of the automatic stay do not require a creditor to forego any rights preserved by Section 553. When the automatic stay is in force, however, those rights can be exercised only in the manner set forth in Section 362. For reasons previously discussed, the Credit Union's freeze is a unilateral determination of the validity of its setoff right under state law. The Credit Union made that determination in this case by relying on a lien created by state law. In doing so, the Credit Union acted to enforce this lien in violation of the express terms of Section 362(a)(4).
 
 
 36
 The Credit Union also violated Section 362(a)(6), which stays "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title." The Credit Union violated this subsection by freezing the Pattersons' accounts and suspending the Credit Union's services while attempting to coerce the Pattersons to make their debt to the Credit Union non-plan. In examining the effect of this coercion under Section 362(a)(6), we note that other courts have found that a letter informing credit union members of the cessation of services and an attempt to have the debtor reaffirm or make a debt non-plan do not violate this subsection. See Brown v. Pennsylvania State Employees Credit Union, 851 F.2d 81 (3d Cir.1988); see also In re Henry, 129 B.R. 75 (Bankr.E.D.Va.1991) (following Brown ); In re Callender, 99 B.R. 378 (Bankr.S.D.Ohio 1989) (same). Those decisions are factually distinguishable from this case. There, the credit unions did not freeze the debtors' accounts and cause them to incur returned check charges. Some of the credit unions in those cases did maintain a policy that allowed them to terminate membership and services to members who cause the credit union a loss. However, enforcement of this policy was not found coercive in those cases because, unlike this case, those credit unions enforced the policy without regard to whether the member had filed bankruptcy. Additionally, there was no issue in those cases of whether the member had, in fact, caused the credit union a loss. The factual scenario in this case is sufficiently distinguishable to constitute an act to collect a pre-petition debt in violation of Section 362(a)(6).
 
 
 37
 The bankruptcy court held that the Credit Union violated the automatic stay because it set off the Pattersons' prepetition debt in violation of Section 362(a)(7). A setoff occurs when (1) a decision to exercise the right of setoff is made; (2) some action which accomplishes the setoff takes place; and (3) some record of the setoff is made. Georgia Federal Bank, FSB v. Owens-Peterson (In re Owens-Peterson), 39 B.R. 186, 189 (Bankr.N.D.Ga.1984). The bankruptcy court held that a setoff had occurred because (1) the letter from the Credit Union to the Pattersons was evidence of the decision to exercise the right; (2) the Credit Union's reduction of its loan, filing of the proof of claim, and freeze of the Pattersons' accounts effectively accomplished the setoff; and (3) the proof of claim was a record of the setoff. We agree.
 
 
 38
 The principal issue on appeal is the bankruptcy court's holding that the second element was satisfied, that is, whether the Credit Union took an action which accomplished the setoff. The Credit Union argues that while a setoff requires an overt act, a freeze is a mere failure to act. See Stann v. Mid-American Credit Union, 39 B.R. 246 (D.C.Kan.1984). In other words, the Credit Union argues that its refusal to pay the Pattersons' checks on presentment, to cash Mr. Patterson's pay check or to allow additional deposits into the Pattersons' account did not constitute an overt act. This argument raises the issue whether a freeze constitutes a setoff, per se. However, we need not address this issue because the bankruptcy court based its holding on more than the freeze alone. Most significant to the bankruptcy court was paragraph 7 of the proof of claim. That paragraph showed the Credit Union's calculation of a present amount due on its claim. The calculation reflected a reduction of the Credit Union's loan balance by the amount in the Pattersons' account. The bankruptcy court found that such statement on the proof of claim, combined with the Credit Union's exclusive control over the funds after freezing the accounts, was an overt act to set off the Credit Union's claim by the amount of the Pattersons' account. Even though another statement on the proof of claim could contradict this inference,[10] we agree with the bankruptcy court's interpretation.
 
 
 39
 Although we do not address here the issue of whether a freeze constitutes a setoff, per se, our opinion eviscerates the logic of those opinions which answer this question in the negative.[11] Those cases rely on the fact that the Code does not explicitly prohibit a freeze. Of primary importance to those courts is the protection of the creditor's right to setoff, a principle that is explicit in the Code. We reject this logic in Part II.A.2. of this opinion. Moreover, as demonstrated above, a freeze can violate provisions of the automatic stay other than Section 362(a)(7) dealing with setoff. Our conclusion sets forth an alternative to the freeze for creditors faced with the dilemma of violating the automatic stay or watching their security disappear.B. Discrimination Because of Bankruptcy
 
 
 40
 The bankruptcy court held that the Credit Union violated Section 525(b), which prohibits discrimination by a private employer, against an individual who has filed for bankruptcy under the Code, solely because of such bankruptcy. The bankruptcy court found that the Credit Union was a private employer for the purposes of this section and that the Credit Union discriminated against the Pattersons solely because of their bankruptcy filing. We agree.
 
 
 41
 Section 525(b) applies to private employers. The definition of employer extends to credit unions affiliated with a particular employer, see In re Callender, 99 B.R. 378 (Bankr.S.D.Ohio 1989), or whose membership is a benefit of employment, see In re Brown, 95 B.R. 35 (Bankr.E.D.Va.1989). We agree with the Callender court's statement that " 'employer' in the present context should be given a broad reading, not bound by conventional state law concepts." In re Callender, 99 B.R. at 380. The bankruptcy court found that membership in the Credit Union is closely affiliated with employment at UniRoyal Goodrich, Mr. Patterson's employer, and this finding is not clearly erroneous.
 
 
 42
 The Credit Union discriminated against the Pattersons solely on the basis of their bankruptcy filing. The discriminatory act was suspending the Pattersons' membership privileges. The Credit Union maintains a policy that any member who causes the credit union a loss shall be denied services. Mr. Phillips testified, however, that the Pattersons had not caused the Credit Union a loss at the time the Credit Union decided to suspend services to the Pattersons. Instead, the Credit Union made that decision upon being informed that the Pattersons had filed for bankruptcy. On this basis, the bankruptcy court found, and we agree, that the Credit Union applied its policy in a manner that discriminates against those who file for bankruptcy. Nothing in this holding abrogates the general proposition that a creditor should not be forced to do business with a debtor. See Brown v. Pennsylvania State Employees Credit Union, 851 F.2d 81, 81 (3d Cir.1988). The Credit Union's policy in furtherance of this proposition is enforceable, however, only when applied without regard to a member's bankruptcy filing.
 
 III. CONCLUSION
 
 43
 The Credit Union violated several provisions of the automatic stay when it froze the Pattersons' accounts and reduced the amount of an outstanding loan by the amount in the account. Such conduct represents a unilateral determination by the Credit Union of its right to setoff, a determination more appropriately within the province of the bankruptcy court. Moreover, the Bankruptcy Code provides creditors such as the Credit Union a means to protect their interest without violating the automatic stay. In addition, the Credit Union discriminated against the Pattersons by suspending membership services; under the facts of this case, such discrimination constitutes a violation of 11 U.S.C. 525(b). Accordingly, we AFFIRM the judgment of the district court.
 
 
 
 *
 Honorable Anthony A. Alaimo, Senior U.S. District Judge for the Southern District of Georgia, sitting by designation
 
 
 [1]
 In fact, a teller at the Credit Union mistakenly accepted a $250.00 deposit after the freeze. From this deposit, the Credit Union paid eight checks in the aggregate amount of $134.82. The Credit Union returned six other checks to payees after January 23. The Pattersons testified that they were required to pay $40.00 in returned check charges to three merchants and that they would owe at least two other such charges to other creditors
 The Credit Union appeals the bankruptcy court's finding that the Pattersons had checks returned with an endorsement of "not sufficient funds." The bankruptcy court's memorandum of decision states that
 seven checks were returned to the payees for insufficient funds, Mr. Patterson testified. The Pattersons suffered a "not sufficient funds" service charge for these returned checks in the amount of $40 because of the freeze.
 Patterson, 125 B.R. at 43. The bankruptcy court did not make an explicit finding regarding the endorsement on the checks, but merely related Mr. Patterson's testimony. Thus, this assignment of error is without merit. The relevant finding, which the Credit Union does not appeal, is that the Pattersons incurred $40.00 in returned check charges.
 
 
 [2]
 That section provides, in relevant part:
 (a) Except as otherwise provided in this section and in sections 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case....
 11 U.S.C. § 553 (1988).
 
 
 [3]
 This is a hotly debated topic. For discussions of this issue, see 4 Collier on Bankruptcy p 553.15 (15th ed. 1992) (freeze should not violate automatic stay because bank is barred by Section 542(c) from honoring prepetition checks); Daniel Keating, Offensive Uses of the Automatic Stay, 45 Vand.L.Rev. 71 (1992) (Section 362(a)(7) should act as means for bankruptcy court to examine the validity of creditor's setoff right before giving it effect); Jack F. Williams, Application of the Cash Collateral Paradigm to the Preservation of the Right to Setoff in Bankruptcy, 7 Bankr.Dev.J. 27 (1990) (freeze should not violate Section 362(a)(7) because Section 363(c) provides adequate protection to both debtors and creditors); and James H. Wynn, Recent Development, Freeze and Recoupment: Methods for Circumventing the Automatic Stay, 5 Bankr.Dev.J. 85 (1987) (freeze for longer than seven to ten days should constitute violation of automatic stay)
 
 
 [4]
 It is undisputed that the Credit Union had an interest in the funds in the Pattersons' savings account. Alabama law gives a credit union "a lien on the shares and deposits of a member for any sums due to the credit union from said member or for any loan endorsed by him." Ala.Code § 5-17-14 (1975). Also, the depository contract between the Credit Union and the Pattersons created an interest in the funds in favor of the Credit Union to the extent of its outstanding loan
 
 
 [5]
 One bankruptcy court held that the debt need not be mature for the creditor to exercise its setoff rights, in spite of state law to the contrary. Traders Bank of Kansas City v. Stonitsch (In re Isis Foods, Inc.), 24 B.R. 75 (Bankr.W.D.Mo.1982); contra Stonitsch v. Commerce Bank of Kansas City (In re Amco Prods., Inc.), 17 B.R. 758 (Bankr.W.D.Mo.1982), rev'd on other grounds, 50 B.R. 723 (W.D.Mo.1983). The Isis Foods court relies on a general principle of law found in Collier on Bankruptcy. However, the general proposition found in Collier "presupposes a right of setoff exists under applicable nonbankruptcy law." Stair v. Hamilton Bank of Morristown (In re Morristown Lincoln-Mercury, Inc.), 42 B.R. 413, 418 (Bankr.E.D.Tenn.1984). Thus, we agree with the Stair court that Collier's proposition is general and only applicable when not in conflict with state law
 
 
 [6]
 A creditor wishing to exercise its right of setoff must move for relief from the automatic stay, pursuant to Section 362(d). The bankruptcy court will normally conduct a hearing on the motion within thirty days. See Section 362(c)
 
 
 [7]
 The relevant portions of that statute provide that
 (a) Except as provided in subsection (b) of this section, a petition filed under ... this title ... operates as a stay, applicable to all entities, of--
 (3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;
 (4) any act to create, perfect, or enforce any lien against property of the estate
 (6) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title; [and]
 (7) the setoff of any debt owing to the debtor that arose before the commencement of the case under this title against any claim against the debtor....
 11 U.S.C.A. § 362(a) (West 1979 & Supp.1992).
 
 
 [8]
 The bankruptcy court held that the Pattersons' funds were property of the estate under 11 U.S.C. §§ 541(a) and 1306(a). This holding is not challenged on appeal
 
 
 [9]
 Congress deliberately has written the statute to give debtors "breathing room" after filing their petition. The automatic stay is one of the fundamental debtor protections provided by the bankruptcy laws. It gives the debtor a breathing spell from his creditors. It stops all collection efforts, all harassment, and all foreclosure actions. It permits the debtor to attempt a repayment or reorganization plan, or simply to be relieved of the financial pressures that drove him into bankruptcy
 S.Rep. No. 989, 95th Cong., 2d Sess. (1978), U.S.Code Cong. & Admin.News 1978, p. 5787.
 
 
 [10]
 Paragraph 5 of the Credit Union's proof of claim employs the future tense of the verb. "No security interest is held for this claim except: $822.78 in a deposit in which claimant has a lien, which will be applied at an appropriate time and is deducted below."
 
 
 [11]
 The bankruptcy court compiled a list of the case law in this area. See Patterson, 125 B.R. at 45 nn. 6 & 7. For a discussion of the relevant cases, see the authorities cited supra note 3