**In re John W. FLYNN, Ruth A. Flynn, Debtors.**

**Bankruptcy No. 92–11258.**

United States Bankruptcy Court, D. Rhode Island.

Aug. 7, 1992.

Christopher Lefebvre, Pawtucket, R.I., for debtors.

Michael T. McGahan, Coogan, Smith, Bennett, McGahan, Lorinca & Jacobi, Attleboro, Mass., for Texas Instruments Federal Credit Union.

## DECISION AND ORDER

ARTHUR N. VOTOLATO, Jr., Bankruptcy Judge.

Heard on June 16, 1992, on the Debtors' Motion to Adjudge creditor Texas Instruments Federal Credit Union ("TIFCU") in Contempt for a Willful Violation of the Automatic Stay, 11 U.S.C. § 362(h). TIFCU pleads "not guilty".

## FINDINGS OF FACT

Based upon testimony elicited at the hearing and the documents submitted, the Court makes the following findings of fact: on April 24, 1992, when the Debtors filed a joint Chapter 7 bankruptcy petition in this Court, and at all relevant times, Ruth Flynn was an employee of Texas Instruments, which employment qualified Flynn and her husband to maintain a banking relationship with TIFCU. Prior to the bankruptcy, Ruth had borrowed money from TIFCU, which she was paying back on a weekly basis through a payroll deduction.

Three days after the filing, by letter dated April 27, 1992, the Flynns' bankruptcy counsel, Christopher Lefebvre, Esq., notified TIFCU of the bankruptcy and instructed that creditor to discontinue Mrs. Flynn's weekly payroll deduction. TIFCU complied with this request, but also placed an "administrative freeze" on the Flynns' checking and savings accounts, prohibiting them access to the funds. As justification for this act, TIFCU argues that "at certain times, it is the credit union's policy to freeze pre-petition funds—they are property of the credit union when the loan goes into default." In addition, immediately following the bankruptcy filing, Michael Tartaglia, a TIFCU credit collection officer, contacted Mrs. Flynn directly, without notifying her attorney, purportedly to inform her as to TIFCU's internal policies when a debtor files for bankruptcy. Tartaglia admitted that he also advised Mrs. Flynn of the options available to her with respect to her two personal loans with TIFCU. These "options" consisted of: (1) continue making voluntary payments; (2) reaffirmation; or (3) consolidating her two existing loans into one, with a lower weekly payment. Noticeably absent from this list was the choice to simply not pay this debt, which presumably was the Debtors' primary intention when they consulted a lawyer and filed this Chapter 7 case.

A few days later, on or about May 1, 1992, Ruth Flynn went to TIFCU's drive up window to withdraw funds from her savings account. The drive up teller broadcast through the loud speaker that Mrs. Flynn's account had been frozen because "she must have filed bankruptcy," and that she should come inside and speak with the manager, Charles Toppings. It is not unreasonable or surprising that this indiscreet public announcement embarrassed Mrs. Flynn. Nevertheless, being somewhat intimidated, she went to see Toppings, as requested.

Once inside, Mr. Toppings showed Mrs. Flynn the letter her attorney had mailed to TIFCU notifying it of the Flynns' bankruptcy and then, according to Mrs. Flynn,[1] Toppings informed her that he would unfreeze the bank accounts if she agreed to reaffirm her two loans with the credit union. During this exchange, Flynn testified that she felt "pressured by the bank" and "threatened that she would lose her job" with Texas Instruments. As a result, she agreed to have her loans rewritten, and met with other TIFCU personnel to handle the paperwork. Although Mrs. Flynn did not sign the new loan documents that day, TIFCU did unfreeze her accounts and she was permitted to withdraw the balance of her funds and close the accounts.

A few days later, Mrs. Flynn visited her attorney to pay her bill, and coincidentally spoke with Mr. Lefebvre about her recent dealings with TIFCU. Upon learning of the credit union's actions (and between hyperventilations) Lefebvre advised Mrs. Flynn to return to the credit union and execute the reaffirmation agreement (to evidence TIFCU's actions), which she did. On May 6, 1992 Lefebvre filed the instant motion.

## CONCLUSIONS OF LAW

### I. The "Automatic Freeze"

This dispute presents a number of controversial and currently popular legal issues which, of late have been arising with increasing frequency in this jurisdiction, to the extent that the following comments and rulings are furnished to assist members of the bar, local financial institutions, and future litigants who may find themselves one day before this Court in similar circumstances.

The first issue deals with the now familiar scenario between banks and debtors as to the legal effect of a bank's placing an "administrative freeze" on a debtor-depositor's bank account, in reaction to the filing of a Chapter 7 or 13 petition.[2] This ongo-

1. *See* footnote 5 *infra.*

2. For purposes of this decision, we do not address the applicability of Chapter 11 to the legal issues analyzed and determined herein. Consid-

eration of those issues will be left for another day, when presented to the Court on specific facts relative to the specialized provisions contained in that chapter of the Bankruptcy Code.

ing debate is exacerbated by a judicial split of opinion as to whether such a freeze constitutes a violation of the automatic stay pursuant to 11 U.S.C. §§ 362(a)(3) and/or 362(a)(7). *See generally* Groschadl, *" 'Freezing' the Debtor's Bank Account: A Violation of the Automatic Stay?"* 57 Am.Bankr.L.J. 75 (1983); *In re Pimental,* 142 B.R. 26 (Bankr.D.R.I.1992) (and cases cited therein); *In re Lange,* 102 B.R. 295 (Bankr.D.R.I.1989); *In re Quality Interiors, Inc.,* 127 B.R. 391 (Bankr.N.D.Ohio 1991); *In re Patterson,* 125 B.R. 40 (Bankr. N.D.Ala.1990), *aff'd* 967 F.2d 505 (11th Cir. 1992); *In re Air Atlanta, Inc.,* 74 B.R. 426 (Bankr.N.D.Ga.1987), *aff'd* 81 B.R. 724 (N.D.Ga.1987); *Kenney's Franchise Corp. v. Central Fidelity Bank,* 22 B.R. 747 (W.D.Va.1982).

■ Before considering this issue however, we take the easy ones first, and respond to TIFCU's cavalier announcement that the credit union had an "undisputed right to freeze the accounts," pursuant to its loan documents which provide that the filing of bankruptcy constitutes an event of default. This argument is flatly rejected on the basis that, absent court approval, private contractual agreements may not over-ride an express provision of the Federal Bankruptcy Code. *See Testa v. Katt,* 330 U.S. 386, 67 S.Ct. 810, 91 L.Ed. 967 (1947) (the U.S. Constitution and the laws passed pursuant to it are the supreme laws of the land); *In re Ann Arbor Brewing Co.,* 110 F.Supp. 111 (E.D.Mich.1951) (since the United States has exclusive jurisdiction under Art. 1, § 8, cl. 4 in bankruptcy matters, provisions of the Bankruptcy Act [Code] are the "supreme law of the land" within the meaning of this clause.)

More specifically, 11 U.S.C. § 541(c) provides in pertinent part:

(c)(1) Except as provided in paragraph (2) of this subsection, an interest of the debtor in property becomes property of the estate under subsection (a)(1), (a)(2),

or (a)(5) of this section not*withstanding any provision in an agreement ...—*
(B) that is conditioned on the insolvency or financial condition of the debtor, on the commencement of a case under this title, ... and that effects or gives an option to effect a forfeiture, modification, or termination of the debtor's interest in the property.

This provision, commonly referred to as the "anti-alienation" or "anti-forfeiture" clause, prohibits a creditor from seizing a debtor's property solely on the basis of having filed for bankruptcy, and prevents unfair discrimination against debtors who seek Bankruptcy Court protection. *In re Jeffrey Glen Winters,* 69 B.R. 145 (Bankr. D.Or.1986) (provision of security agreement that bankruptcy filing constitutes default entitling creditor to repossession of collateral is unenforceable, and any action to enforce provision would be violative of automatic stay and, upon closing case, is a violation of § 524(a)(2)). Accordingly, TIFCU's contention that when the Flynns' filed their Chapter 7 petition the funds in their pre-petition bank account became the property of TIFCU pursuant to the terms of their loan documents, is incorrect as a matter of law.

Having said this, we return to the issue of whether TIFCU's placing of an administrative freeze on the Flynns' accounts constituted a violation of the automatic stay. As mentioned, there are two divergent views on this issue, primarily due to the inherent conflict between the various Code sections, *see* §§ 362(a)(2), 362(a)(7), 541, 542(b), 553.

Those courts holding that a freeze does not violate the automatic stay focus on the interplay between §§ 362(a)(7), 542(b) and 553. They reason that because a "freeze" does not go the extra step of applying the deposited funds to the indebtedness due the bank, no setoff has taken place, and therefore § 362(a)(7) has not been violated.[3] *Baker v. Nat'l City Bank,* 511 F.2d 1016,

---

**3.** It has been held that a setoff includes three elements:
(1) a decision to setoff; (2) an overt act; and (3) a record indicating that a setoff has occurred.

*Baker v. Nat'l City Bank,* 511 F.2d 1016, 1018 (6th Cir.1975). A "freeze" generally implicates only the first element.

1018 (6th Cir.1975); *Air Atlanta, Inc. v. National Bank of Georgia*, 81 B.R. 724; *Kenney's Franchise Corp. v. Central Fidelity Bank*, 22 B.R. 747.

In addition, attention is centered on § 542(b), which *excepts* from turnover property of the estate that "may be offset under section 553 of this title against a claim against the debtor." Thus, these cases hold the automatic freeze is consistent with § 542(b) and allows the bank to hold the funds until its setoff rights are judicially determined. *See, e.g., Air Atlanta*, 81 B.R. 724; *Kenney's*, 22 B.R. 747; *Third Nat'l Bank v. Carpenter (In re Carpenter)*, 14 B.R. 405 (Bankr.M.D.Tenn. 1981).

Twice previously we have followed the line of cases holding that the placing of a freeze is a violation of the automatic stay, §§ 362(a)(3) and/or (a)(7). *In re Pimental*, 142 B.R. 26 (Bankr.D.R.I.1992); *In re Lange*, 102 B.R. 295 (Bankr.D.R.I.1989); *accord In re Patterson*, 967 F.2d 505 (11th Cir.1992); *In re Quality Interiors, Inc.*, 127 B.R. 391 (Bankr.N.D.Ohio 1991); *First Connecticut Small Business Investment Company v. Bank of Boston Connecticut (In re First Connecticut Small Business Inv. Co.)*, 118 B.R. 179 (Bankr.D.Conn. 1990); *Homan v. Kemba Cincinnati Credit Union (In re Homan)*, 116 B.R. 595 (Bankr.S.D.Ohio 1990).

■ Although in our previous rulings we don't specifically recall having § 542(b) in mind in finding a technical violation of the stay, our present review of this Code section points up the inconsistency in the application of these different provisions. Nevertheless, we continue to believe that § 362(a)(3) controls with respect to this incongruity, as we find its language to be comprehensive, wide-sweeping and direct. We are also persuaded by the rationale given by the bankruptcy court in *In re Patterson*, 125 B.R. 40, 44 (Bankr.N.D.Ala. 1990), *aff'd* 967 F.2d 505 (11th Cir.1992), that the July 10, 1984 amendment to 11 U.S.C. § 362(a)(3), which added the words "or to exercise control over property of the estate," indicated a congressional intent to broaden the reach of the automatic stay.

Notably, § 362(a)(3) provides that the automatic stay applies to: "any act to obtain possession of property of the estate or of property from the estate or to *exercise control over property of the estate*." (emphasis added). The placing of an administrative freeze on a debtor's bank account is undeniably an act designed to "exercise control over property of the estate," and thus we conclude is an express violation of the automatic stay.[4] *Accord In re Quality Interiors, Inc.*, 127 B.R. 391.

As *In re Quality Interiors*, we subscribe to the reasoning of Judge Conrad in *In re Wildcat Const. Co., Inc.*, 57 B.R. 981 (Bankr.D.Va.1986), that

> perhaps the most fundamental problem with countenancing the freezing of the debtor's bank accounts before any judicial determination of the rights of the parties has been made is that it begs the critical question, assuming in advance the precondition for its validity … the freeze is essentially an extra-judicial temporary restraining order.

*In re Quality Interiors*, 127 B.R. at 394 (quoting *Wildcat Construction*, 57 B.R. at 981).

Coincidentally, as this decision was being researched and drafted, the Eleventh Circuit handed down *In re Patterson*, which involved a strikingly similar fact pattern as presented here. Notably, the Eleventh Circuit held that "[t]he freeze is a unilateral, extrajudicial determination by the creditor that the setoff right is valid. By providing a procedure for judicial determination, the Code eschews such creditor self-help." *Id.* at 510. We find that analysis persuasive and feel that it represents the better view in this continuing debate. Accordingly, we adopt herein the reasoning of the Eleventh Circuit in holding that such a freeze does constitute (at least a technical) violation of the automatic stay, § 362(a)(3).

---

4. We agree however with those courts holding that such a freeze, without more, does not constitute a setoff, and therefore is not violative of § 362(a)(7). *Baker*, 511 F.2d 1016. To the extent that our decision in *In re Lange* reached or indicated a contrary conclusion, it is reversed.

■ But this conclusion does not fully resolve what we consider to be the greater dilemma before us. As discussed, although there is an obvious inconsistency in the various Code sections on this issue, each provision was created to serve a specific and worthwhile purpose. Thus, the automatic stay section was intended to prevent creditor abuses, and §§ 541 and 542 were designed to protect against debtors (or other creditors) improperly and unfairly depleting estate assets. In order to achieve both of these desirable results, *i.e.* to preserve the status quo pending a court determination, we adopt the rule espoused by the Eleventh Circuit in *In re Patterson*, 967 F.2d 505, that, in order to protect the possible right to a setoff of funds, creditors may

> file an ex parte motion pursuant to Sections 362(f) or 363(e) and accompany this motion with the funds from the debtor's account to be paid into the registry of the bankruptcy court. This approach strikes the proper balance between the parties' interests. The creditor is protected from the risk that funds will be insufficient or unavailable to satisfy a later-determined valid right of setoff. The debtor is protected from the risk that a creditor will unilaterally deny the debtor access to funds in which the creditor does not have a valid right of setoff. This procedure will occur rather quickly.... In contrast to the freeze, which constitutes an act of control over the account, paying the funds into the registry of the court with an accompanying expedited motion is an abdication of control by the creditor in favor of the bankruptcy court's determination of the disposition of the funds.

*In re Patterson,* at 511, 512; *accord In re Quality Interiors, Inc.,* 127 B.R. at 395.

Having so ruled, we conclude here that TIFCU did violate the automatic stay by placing a freeze on the Debtors' bank accounts. However, in view of our only instant pronouncement on this issue, and the fact that TIFCU did act reasonably and expeditiously in removing the freeze on the Debtors' bank accounts once Mrs. Flynn requested withdrawal of her funds, no award of sanctions is warranted.[5] Moreover, as we discussed in *In re Pimental,* on the facts before us it is unclear whether the Flynns properly claimed an exemption in these funds, or whether such funds were property of the estate which should have been turned over to the Chapter 7 Trustee. That issue is not before us today, and we do not address it further.

## II. *Reaffirmation*

■ The second major issue for consideration, is whether TIFCU's solicitation of the Debtors' reaffirmation[6] constituted a violation of the automatic stay.

Section 362(a)(6) provides that the filing of a petition in bankruptcy operates as a stay against:

> "(a)(6) any act to collect, assess, or recover a. claim against the debtor that arose before the commencement of the case under this title;"

Moreover, Bankruptcy Code §§ 524(c) and (d) set forth detailed and strict prerequisites to the reaffirmation of an otherwise dischargeable debt.

Based upon the evidence adduced at trial, we find as a fact that an officer of TIFCU communicated directly with Mrs. Flynn immediately after her bankruptcy filing, with full knowledge that she was represented by counsel, and that said contact was for the specific purpose of obtaining a reaffirmation of her debt with the credit union. This blatant circumvention of the stay/dis-

**5.** However, we expressly disapprove of what was suggested to be TIFCU's reason for removal of the freeze on the Debtors' bank account—that she had agreed to reaffirm her debt with the credit union. If proven, we would find such conduct also to constitute a willful violation of the stay, deserving of sanctions. However, on the facts presented, which appeared to be speculation on Mrs. Flynn's part, we are unable to

make such a finding, and TIFCU dodges this bullet.

**6.** Although a considerable amount of time was spent at the hearing discussing the difference between "reaffirmation" and the "rewriting of a loan", the Court views this point as a distinction without a difference in the context of an alleged violation of § 362(a)(6).

charge provisions is without question a willful and intentional violation of the automatic stay.

Moreover, when Mrs. Flynn appeared at the credit union a few days later, another TIFCU officer, this time the manager, also attempted to induce her to reaffirm the debt, again without the knowledge or advice of her counsel, and again in clear violation of the stay. Considered in their totality, these circumstances, together with the fact that Mrs. Flynn was an employee of Texas Instruments and (reasonably) felt threatened regarding her continued employment, give rise to a sanctionable claim for damages under § 362(h). *See In re Danny and Debra Johnson*, 138 B.R. 352 (Bankr.D.R.I.1992); *In re Newport Offshore, Ltd.*, 88 B.R. 566 (Bankr.D.R.I.1988); *Goichman v. Bloom (In re Bloom)*, 875 F.2d 224 (9th Cir.1989) (violation may be willful where defendant knew of the stay and its actions were intentional).

Recently this Court decided *In re Danny and Debra Johnson*, 138 B.R. 352, which held that the creditor's post-petition action to obtain an assignment of insurance proceeds was an intentional violation of § 362(a), and ordered the payment of compensatory damages. Here, upon the Court's own inquiry, TIFCU's management confessed their familiarity with and knowledge of the automatic stay provisions, and unabashedly took the position that their unilateral, thinly disguised "reasons" for contacting the Debtor insulated TIFCU from the automatic stay provisions of the Code. We disagree completely, and rule that the actions of TIFCU were an obvious and intentional effort to take advantage of this Debtor, while denying her the benefit of her own lawyer, for the sole purpose of preserving its claim against her. This, we think, is precisely the type of conduct that is forbidden by § 362(a)(6), and which warrants the assessment of compensatory *and* punitive damages. *See In re Crysen/Montenay Energy Co.*, 902 F.2d 1098 (2nd Cir. 1990) (malicious or bad faith violation of automatic stay justifies imposition of punitive damages).

It was also, of course, ethically improper for TIFCU to contact Mrs. Flynn directly, knowing that she was represented by counsel. If, as it claims, the credit union's only purpose in telephoning the Debtor was to advise her of the change in her banking services as a result of her bankruptcy filing, that information could have been communicated simply by sending a letter to her attorney, with a copy to the Debtors.

We find the facts in this case to be far more egregious than those presented in *Brown v. Pennsylvania State Employees Credit Union*, 851 F.2d 81 (3rd Cir.1988), relied upon by TIFCU. In fact, we agree with the holding in the *Brown* case that the mere mailing of a letter to the Debtor advising of the bank's policy to limit or extinguish services, by itself, is not an attempt to collect a debt prohibited by § 362(a)(6). However, the creditor's transgressions here go far beyond those in *Brown* and clearly demonstrate an unauthorized and intentional effort by TIFCU to coerce Mrs. Flynn into reaffirming her obligation.

In determining the appropriate measure of compensatory and punitive damages for the instant stay violation, the Court is not interested in financially punishing TIFCU beyond the spirit of this Order. Rather, we are desirous of achieving compliance with the automatic stay provisions, vis-a-vis future debtors. Accordingly, and pursuant to § 105, we consider it appropriate to issue a permanent injunction against TIFCU from engaging again in conduct such as was disclosed here. TIFCU is also ordered to furnish this Court with a revised statement of policies and procedures to be followed when a member (depositor) files bankruptcy, with the understanding that said new procedure will be implemented within thirty days of this Order. Alternatively, if TIFCU declines to revise its internal policies as ordered, we hereby impose punitive damages in the amount of $5,000 pursuant to § 362(h) for its willful and intentional violation of the automatic stay. In addition, TIFCU is ORDERED to pay compensatory damages in the amount of $750 to Mrs. Flynn, as compensation for her embarrassment and intimidation, as

well as inflicting upon her, concern over the possible loss of employment. Finally, TIFCU is ORDERED to pay $1,000 in attorney fees to Christopher Lefebvre, Esq., as compensation for his bringing this matter before the Court.

Enter Judgment consistent with this opinion.